Good morning. May it please the Court, I'm Judith Seeds Miller on behalf of Petitioner Leonid Korbukh. Your Honors, this case is about the cumulative effect of a lifetime of suffering anti-Semitic acts, the cumulative specific instances of violence and harassment by both the government, that is the police, the special police or OMON, the city government, and by those the government cannot or will not control, causes the treatment which Korbukh endured to rise to the level of persecution. Respondent argues that the termination of Korbukh's peer leases, quote, standing alone, is not persecution. He argues that the threatening telephone calls from members of the ultra-nationalist Chernovsky party, quote, do not amount to persecution, and that the incident in 1994 in which Korbukh and his friend were beaten by 15 ultra-nationalist anti-Semites was, quote, an isolated incident. But at some point, things do not stand alone and cannot be viewed as isolated incidents in one's life. Although Korbukh's opening brief repeatedly referred to the cumulative effect of these incidents, Korbukh's respondent did not respond in his brief as to why a cumulative view should not be taken. Counsel, there's another issue here, and that at least as I understand what the agency did here, and that is that there was a finding that the motivation for some of the things that happened to your client, not all of them certainly, but some of them were motivated by pure criminal greed that might have affected similarly situated non-Jews. And to the extent that the I.J. permissibly concluded that there were other reasons, can those events be put into the cumulative mix? Absolutely, Your Honor. I'd like to address that. Specifically, what he was referring to was the seizure of Korbukh's business, that is, the cancellation several years prematurely of the very valuable peer leases without which the business could not operate. And what the I.J.'s interpretation stemmed from, and really it was impermissible conjecture, not just a misinterpretation of the law of this circuit regarding mixed motive, although that law hadn't come down yet, it was two years later. But what he based that on was the fact that the ultra-nationalist, anti-Semitic Chernovsky Party, which ruled the city government, was also inextricably intertwined with Russian mafia. And what he conjectured was, well, couldn't this have just been some criminal mafia member wanting to give this business to a friend of his? And your client said essentially it's possible because there's a lot of criminality. Well, what he said was that it's impossible to say where the government begins and the mafia ends. And what this circuit has held is that if the motivation is at least in part on a protected ground, and here the perpetrators were members of this ultra-nationalist, anti-Semitic Chernovsky Party that run the government there. And he also made – Korbuch also made an offer of proof that his friend would have testified if the court had continued the matter to November, had been requested, would have testified that he was present personally at the meeting in which the city government discussed seizing these contracts and taking over the business. And they specifically discussed the fact that Korbuch is a Jew. Thus, I don't think that there's absolutely any basis for the judge to have found that it was because of a criminal motivation and not at least in part, and that's the language that the law requires on account of the protected ground, that being an anti-Semitic act. But there are so many anti-Semitic acts which occurred throughout his life. Korbuch lost his first job in the 80s as a result of anti-Semitism, and indeed that theater has not hired a Jew since that time. He testified that periodically he found Stars of David on his car and on his front door. As I said, in January of 1994, he and his friend were beaten by a group of anti-Semitic ultra-nationalists. Those men were a member of a group called the Society Parmiat, which later merged with the Chernovsky Party. And that beating resulted in injuries which required medical attention. The I.J. said about that one that it had to do with the fact that he was interfering in a situation in which he was not initially involved and that it also was not related to his religion. What is your response to that? Actually, Your Honor, the January 1994 incident in the restaurant or just outside the restaurant, the I.J. agreed that that probably was anti-Semitism. Okay. Your Honor, maybe you're thinking of the wrong incident. And then there was a later incident, I believe the Court is referring to July 1995, where Mr. Korbuch was driving by and saw two members of Oman, special police or members of Oman, beating two Jews. He recognized one. He pulled over out of a sense of duty to help his friend and said to the officers, stop beating these men. The officer turned to him and said to his buddy in a mocking way, oh, look what we have here, another Jew. Here's another Jew, and sprayed him in the face with tear gas. Now, the Court said in his oral decision that Korbuch was interfering with police business, and that was the motivation, and also said that they were dealing with demonstrators. I've read the record over and over, and Korbuch never testified. There was no demonstration. There were no demonstrators. He testified. He saw the police beating two Jewish men, and that specifically is at pages 142 and 143 of the record. But as I said, I've gone through the direct, the cross, over and over, and I found no reference to there being any demonstration. But in any event, once again, even if the Court were to say that perhaps it was in part because he was interfering with police business, surely they went above and beyond what they needed to do to get him to stop interfering with them. He was only speaking to them. He wasn't physically interfering. But more importantly, it's clear from the language that the officer used, look here, here's another Jew, and then sprayed him in the face with the tear gas, that it meets the standard of being at least in part motivated by a protected ground. I understand that although the immigration judge expressed that he didn't think Mr. Korbuch was telling the truth on everything, he didn't make a negative credibility finding, is that right? No, he didn't. And, Your Honor, I believe I understand why he, what he was saying was that he wasn't necessarily truthful with regard to his subjective fear. And what he was basing that on, he being the immigration judge, was that Korbuch had been here in the United States two times prior and did not apply for asylum. But that really goes to the whole point, this is the cumulative effect. And just in Korablina, Korablina, where the petitioner had witnessed attacks, had herself been attacked and tied up with a noose, had had a friend disappear, and it finally took her boss's disappearance to make her realize, hey, I better get out of here. Similarly, here, the first two times he was in the United States, he didn't have that subjective fear. It took the breaking of the peer leases. It took the death threats. It took the murder of the similarly situated Jewish businessmen to make him realize they're serious. What, if I'm remembering my cases correctly, I may be mixing them up, but in this instance, did the I.J. find in the alternative that there was no well-founded fear of future persecution? Am I mixing this case up with another one, or was that alternative? No, he did find that, Your Honor, basing it largely on the New York Times article, which he read as saying that there's a virtual Jewish renaissance in Russia. And as a matter of fact, the I.J.  Absolutely not, Your Honor. Indeed, the New York Times article, and I'm worried I'm not going to have any time for rebuttal, but the New York Times article, the focus of the whole article is that the fact that Jews are now more visible under the new government and are in more aspects of society is actually creating a resurgence of anti-Semitism. And indeed, that's the title of the article, that the rise of Jews in Russia is bad for them. I don't know how he was able to interpret that article as saying that the situation is wonderful for Jews in Russia, but he believed that so strongly, despite the evidence, that he refused to believe Mr. Korbuch when he said that there was no synagogue in Vladivostok. Your Honor, I'd like to reserve at least my last 40 seconds for rebuttal. No, it's a negative 40 seconds. Oh, pardon me? Oh, this is a negative 40 seconds? Don't worry. You don't have to give anything back. Thank you. May it please the Court, Jennifer Keeney for the government. This petition for review, Your Honor, should be denied because the record evidence does not compel a conclusion that petitioner established past persecution or a well-founded fear of future persecution on account of a protected ground. I'd like to note first that this petitioner had three opportunities to establish eligibility for asylum before the agency. First, in a non-adversarial proceeding before an asylum officer, then represented by counsel before an immigration judge, and finally before the board. Substantial evidence supports the immigration judge's finding that petitioner failed to show that two of the three incidences that he testified were on account of a protected ground. Let's take the one that counsel stressed. The least? No, not the least one for now, but just his intervention when the police were beating someone else up. Counsel says that the record does not contain evidence that this was a protester being beat up. The IJ used that terminology without any evidence of that, and that the person was beating up another Jewish person or two Jewish people, and so Corpus stopped. Does the record show that the police were acting against a protest, or does it show that they were beating up someone else who was Jewish? Based on the testimony, it's not clear whether there was a demonstration going on at that time. Was there any testimony that there was a demonstration? There wasn't any testimony either way, whether there was or was not a demonstration at the time. Well, then how do we deal with that if the IJ makes a – I mean, I realize it's just one piece of evidence or one fact in the ruling, but how do we deal with that if the IJ describes it as a protest situation? Well, I think the significance, the error in calling it a protest or a demonstration or not, is pretty harmless in this particular case. The immigration judge's particular point was to say that, and Petitioner's counsel on direct had said that Petitioner approached the police officers, they made a disparaging remark, and then they sprayed him and beat him up. And that's not how he testified to it. He testified that he stopped his car, he interrupted the police activity, and they sprayed him immediately, and then he heard a remark happening. So the immigration judge found that the evidence did not support a finding that the police were motivated or actively sought out to harm Petitioner in that instance. With regard to the lease, I think that Petitioner's counsel also mischaracterized the testimony. Petitioner had put an offer of proof regarding a friend who was going to testify about how and why he lost the lease. This was a proffer of proof. Petitioner, in his own testimony, did not state that his friend was at a meeting, that they discussed him specifically and identified him as Jewish and decided to deny his lease. It's not clear at all. Furthermore, the immigration judge gave a continuance to allow Petitioner to put forth an affidavit or put together an affidavit of this individual to put it down, to establish if there was a connection. So, again, the immigration judge found that the record did not support Petitioner's inference that it was on account of his religion. Furthermore, the immigration judge found that even if all of these incidences that Petitioner testified to were on account of his religion, they did not rise to the level of persecution, but, in fact, rose to the level of discrimination and harassment. Petitioner's counsel indicated that there is the record indicates that. Where is the line? Where do you draw the line between discrimination and persecution? Well, this Court has found that discrimination only in extreme situations would be considered would rise to the level of persecution, and you look at it cumulatively. In this case, Petitioner testified to a 1994 fight outside of a restaurant, that the immigration judge said was probably by anti-Semitics. He left Russia on two occasions, came to the United States and returned. I thought the immigration judge said it was definitely anti-Semitic. At least that's the way it reads. Right. Not probably, but that. He found, yes, he found. I understand the slang term that was disrespectful to Jewish people, and it seems like at least that incident was clearly an anti-Semitic fight. That's correct. And, again, the immigration judge found that the severity of that incident was undermined by the fact that Petitioner had left Russia on two occasions, came to the United States, didn't seek asylum, and returned back. And, again, I'd like to note that in this particular case, based on this record, the immigration judge did consider the totality of the circumstances. Petitioner, with his parents under the Soviet regime, was able to attend university, graduated from college, had an apartment, cars, was able to set up two very prosperous businesses, was able to travel. So taken as a whole, the immigration judge found that the experiences that he had suffered in the past did not rise to the level of persecution. Because he failed to establish past persecution, the immigration judge and the agency of the board properly found that because he had failed to show that he had been persecuted in the past, he didn't show that the circumstances in Russia had changed such that he would now fear persecution in the future, he failed to establish a well-founded fear of future persecution. And the immigration judge didn't stop there. It also identified the fact that Petitioner's individual that he had proffered a proof regarding was a Jewish businessman who resided in the area, similarly situated individual who was living there without incident, and also Petitioner failed to establish that he couldn't relocate to another area within Russia. Specifically under this point, Petitioner noted that he could, he was able to obtain the leases for his business in the first place from Moscow, that it was a change in government procedure that allowed the state government or the local government to terminate the lease. The immigration judge specifically asked him, well, why can't you move to Moscow? Why can't you set up some kind of business elsewhere? And he identified antisemitic, personal antisemitic feelings, but he didn't indicate that he feared that he would be persecuted if he relocated. I thought, and I could be wrong in this or it might have been changed, but I thought we had Ninth Circuit precedent in some case or cases saying that if he showed that he was persecuted in one city in Russia, that the burden would be on the government to prove that he could have relocated to Moscow or somewhere else, not that the burden would be on him to show that he would be in danger there. That's correct if he established past persecution. But he failed to show that the incidences that he had suffered rose to the level of persecution. It was his burden to establish that he couldn't relocate safely throughout elsewhere within Russia. The Court's holding on that is regarding whether once you set up the presumption of a well-founded fear because you established past persecution, then the burden is on the government to show that he couldn't relocate. But if we thought the evidence compelled a showing of past persecution in Vladivostok, then I take it we wouldn't sit here and we wouldn't then consider could he have gone to Russia because that wasn't. That's correct. And this, I mean, if this Court found that it rose to the level of past persecution, it would need to remand to the agency to allow the government to rebut the presumption of a well-founded fear. To sum up, Your Honors, this petition for review should be denied because the compelling evidence does not support a finding the petitioner established past persecution or future persecution on account of a protected ground. Thank you. Oh, Russia's a paradise. Don't you know that? I mean, what's wrong with us? It's a beautiful place. Your Honors, I'd like to point out that actually in the record on pages 153 to 154, Mr. Corbett did testify that Mr. Alexander Yakovets was in attendance at the meeting where the city government decided to terminate the contract. So if the Court would like to see it in the record, that actually was his testimony, that his friend was present at the meeting and where they discussed that it was largely or even in part on account of the fact that he was Jewish. Also, Your Honors, and I wish I had an answer regarding whether there was that law that the Court was just discussing, but in any event, Mr. Corbett cannot go elsewhere. The House report, which Respondent never addressed in its brief, supports a finding of the resurgence of virulent anti-Semitism throughout the country, that it's flourishing under the new freedom and feeding on the bad economic times. And the need for a scapegoat, and that the government is too weak to control it and often doesn't want to. Further, the Chernovsky party, which is a national party, is now out to get Corbett, as evidenced by its threats. And the same people and their cohorts are in the Russian mafia, which is also a national group. There is simply nowhere else for Mr. Corbett to go. And we ask that the Court grant this petition for review. Thank you very much. The matter will stand submitted. And we'll come to the next case.
judges: Pregerson, Graber, Gould